UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

KATHRYN HENDRIXSON,                              |        Case No. 1:07-cv-512
                                                 |
         Plaintiff,                              |        HONORABLE PAUL MALONEY
                                                 |
                v.                               |
                                                 |
BASF CONSTRUCTION CHEMICALS, LLC,                |
                                                 |
         Defendant.                              |
                                                 |

---

**Opinion and Order**

**Granting the Defendant's Motion for Summary Judgment as to the ADA Claim;
Declining Supplemental Jurisdiction over the State-Law Claim;
Terminating the Case**

        This is an action under the Americans with Disabilities Act, 29 U.S.C. § 12101 *et seq.*

("ADA"), with a pendent claim under the Michigan Persons with Disabilities Civil Rights Act,

MICH. COMP. LAWS § 37.1101 *et seq.*  Defendant BASF Construction Chemicals LLC, identified

in the complaint as BASF Corporation ("BASF"),[1] terminated the employment of then-37-year-old

plaintiff Kathryn Hendrixson ("Hendrixson") in July 2006.  The termination letter stated that the

reason was her "inability to perform the essential job functions for the position of Packager."  *See*

---

[1]

        The defendant states that its proper legal name is BASF Construction Chemicals LLC, and
Hendrixson "asks that this Court . . . make a substitution to allow the appropriate corporate
defendant to become the defendant in this case."  Hendrixson's Brief in Opposition to Motion for
Summary Judgment, filed May 12, 2008 ("Hendrixson's Opp") at 1 n.1.  The court grants
Hendrixson's request and directs the Clerk of Court to change the caption to reflect that the name
of the defendant is BASF Construction Chemicals LLC, not BASF Corporation.

Defendant BASF's Motion for Summary Judgment filed April 10, 2008 ("MSJ"), Ex. 9.  Hendrixson

contends that the termination violated the ADA because it was based on BASF's erroneous

perception that she was disabled, or its awareness that she had a history or record of disability, or

both.  *See* Complaint filed May 25, 2007 ("Comp.") ¶ 25.  BASF responds that Hendrixson has

admitted that she is not disabled, that there is no evidence that it perceived or regarded her as

disabled, and that she was in fact unable to perform some of the essential functions of her job as a

packager.  MSJ at 1 and 15.

The court determined that oral argument was unnecessary.  For the reasons that follow, the

court will grant the defendant's motion for summary judgment.

## BACKGROUND

In September 2004, Hendrixson began working as a packager for DeGussa Construction

Chemicals Operations, Inc. ("Degussa")'s facility in the Village of Mattawan, Michigan, through

a "labor broker",[2] i.e. as a temporary worker.  In April 2005, Degussa hired Hendrixson as a direct

employee.  Comp. ¶¶ 7-8; Ans. ¶¶ 7-8.  During the relevant time period, the plant manager was

---

[2]Our Circuit has described a labor broker as follows:

> The customers of a labor broker typically call in their employment needs on a
> daily basis, and workers are sent by the broker to fill these needs.  After arriving
> at the place of business, the worker is subject to the control and authority of the
> customer and the customer's supervisory personnel.  The customer has the power
> to discharge the worker from the daily work assignment and can refuse to accept a
> worker sent by the broker.  The customer does not pay the employee directly.
> Rather, the labor broker pays the employee and includes as part of its charge to
> the customer amounts to cover its expenses for compensation premiums, social
> security, and other taxes.

*Binder v. Indiana Michigan Power Co.*, 1995 WL 469427, *2 (6th Cir. Aug. 7, 1995) (quoting
*Farrell v. Dearborn Mfg. Co.*, 330 N.W.2d 397 (Mich. 1982)).  Under Michigan law, the
customer and the labor broker are considered co-employers of the worker.  *Id.*

Michele Barney, who has been deposed and submitted an affidavit.  It appears that one of Hendrixson's supervisors was Stephen Grusell, who has *not* been deposed or submitted an affidavit.

The Mattawan facility produces construction adhesives, acrylic coatings, water sealants, and caulks, which are packaged in tubes, pint cans, quart cans, and multi-gallon buckets.  MSJ at 1 (lacking citation to the record).  The smaller tubes and cans are packaged in boxes for shipping, but the multi-gallon buckets are placed on pallets and wrapped for shipping.  MSJ at 1 (lacking citation to the record).  Hendrixson primarily worked on the acrylic line, but she also worked occasionally on other lines in the packaging department, including the "Ucrete" line, which involved taking gallon and half-gallon buckets, putting them under a spout, opening the spout, filling the buckets, shutting the spout, and sliding the buckets over.  Deposition of Plaintiff Kathryn Hendrixson dated November 20, 2007 ("Hendrixson's Dep") at 18:1-25.

The parties agree that Hendrixson's duties as a packager included regularly lifting buckets which could weigh at least 70 pounds.  *See* Hendrixson's Dep at 18:1-12 (acknowledging that packaging job required lifting of buckets weighing 10-72 pounds) and Barney Dep at 3:1-15 (depending on the product, a full bucket weighed 35-70 pounds) and 36 (buckets full of acrylic product could weigh as much as approximately 70 pounds).  Plant Manager Barney further testified, without contradiction by Hendrixson, that a packager on the acrylic line could be required to lift as many as 1,000 full buckets during each eight-hour shift.  Barney Dep at 3:16 to 4:9 and 36-37.  Moreover, at Hendrixson's deposition, BASF proffered a written job description for the packager job, and Hendrixson agreed that that description was an accurate summary of her job duties, including the need to "operate packaging line while loading units to be packaged and preparing finished product for delivery or warehousing . . . perform work on various packaging lines" and "be

-3-

able to lift 50 pounds throughout the shift" with a "maximum lifting requirement" of "80-90 pounds." *See* Hendrixson's Dep at 19:6-16 and MSJ, Ex. 3 (packager job description).

In late June 2005, Hendrixson sustained a new neck injury and/or exacerbated an old neck injury[3] at work in the evening, in the latter part of a 10- to 12-hour shift.  Hendrixson was

> getting the line ready for the next . . . tank and . . . pulling buckets apart, and I want you to know they were stacked 10 high, so they were probably a good four and a half, five foot stacked off the ground.  I went to pull one apart and felt a burning sensation in my neck. * * * I had the burning sensation in my arm, my neck.

> And I also want to state that this happened in late evening, because we were working 10 to 12-hour days then.  And, yes, it didn't get reported until the next day, but that's because there was no one there to report it to.

Hendrixson's Dep 15:12-25.  In addition to the burning sensation in the arm and neck, Hendrixson also felt sharp pains on the right side of her neck, and a burning sensation and numbness radiated down her right arm.  Comp. ¶¶ 9-10.  She reported the injury to supervisor Jerry Prater the next day. Hendrixson's Dep 15:25 to 16:3.  Hendrixson was examined by a physician whom she refers to as a Degussa company physician (Dr. Harris Russo, M.D.)[4] on July 20, 2005, but he did not place any restrictions on her ability to work.  Five days later, however, Hendrixson's family physician (apparently Dr. Brittan, M.D.) examined her and restricted her from working.  Comp. ¶¶ 11-12; *see* Hendrixson's Dep 48:21-235 (calling Dr. Brittan her "regular doctor").

---

[3]

*See* Russo Aff, Ex. 2 (one-page Progress Notes of Jeanne L. Fielder, PA-C, and Eric L. Lean, M.D., dated July 26, 2005 and based on July 25, 2005 exam): "Kathryn comes in today with neck pain . . . .  She tells me she has a remote history of "whiplash" but no other acute neck injuries."

[4]

BASF denies that Hendrixson saw "a company doctor", Ans. ¶ 11, but of course the court is obliged to assume the truth of Hendrixson's factual allegations because she is opposing summary judgment.  For purposes of this motion, neither party has shown how the employment or contractual status of Dr. Russo is a material fact.

In contrast, BASF does not mention Hendrixson's alleged June 2005 workplace injury. BASF alleges only that "[i]n July, 2005 . . . Plaintiff sustained a *non-work*[-]*related* injury to her neck which later required surgery."  MSJ at 2, citing Hendrixson's Dep at 15-16.  Consistent with BASF's allegation on this score, Hendrixson's handwritten Patient Information Form dated August 5, 2005 has "No" checked next to the question "Is this due to a work related injury?"  Nonetheless, it is of no consequence if the court assumes *arguendo* that Hendrixson's injury was work-related, as her complaint alleges, and the court does so assume.[5]

Dr. Romolo Harris Russo, M.D., F.A.C.S., first examined Hendrixson on August 22, 2005, diagnosing "a disc extrusion on the right at C6 [/] 7 with a very significant amount of right radiculopathy.[6]  Because of the intractability and the severity of the pain we are going to bring her in after Labor Day, [at] her request, for an interior cervical decompression[7] and bone graft fusion."  Affidavit of Dr. R. Harris Russo, M.D., dated May 7, 2008 ("Russo Aff"), Ex. 2 at 7 (Russo letter

---

[5]

The cause of Hendrixson's neck/spine injury may be relevant in other proceedings, such as worker's compensation.  But neither party has shown how this is a material fact for summary judgment on an ADA claim.

[6]

Radiculopathy is a disease of the nerve roots, *Turner v. Comm'r of Soc. Sec.*, 267 F. App'x 456, 460 n.2 (6th Cir. 2008) (Bell, Chief U.S.D.J., by designation) (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1595 (31st ed. 2007)), "supported by objective clinical findings of nerve pathology." *Iley v. Metro. Life Ins. Co.*, 457 F. Supp.2d 777, 780 (E.D. Mich. 2006), *rev'd o.g.*,, 261 F. App'x 860 (6th Cir. 2008).  *See also* STEDMAN'S MEDICAL DICTIONARY 1622 (28th ed. 2006) ("STEDMAN'S").

[7]A spinal decompression is "the removal of pressure from the spinal cord as created by a tumor, cyst, hematoma, herniated nucleus pulposus, abscess, or bone."  STEDMAN'S 497.

A spinal fusion accomplishes the "bony ankylosis" between two or more vertebrae, also known as synostosis, an "osseous union between two bones that are not [naturally] supposed to be united."  STEDMAN'S 95 (bony ankylosis) and 780 (spinal fusion) and 1920 (synostosis).

dated Aug. 22, 2005 to Dr. Vincent Cabras, M.D.).  The parties agree that Dr. Russo performed neck decompression and fusion surgery on Hendrixson in September 2005, and she went on a medical leave of absence.  *See* Comp. ¶¶ 13-14; *accord* MSJ at 2, citing Hendrixson's Dep at 16 & 20.  On October 25, 2005, about seven weeks after the surgery, Dr. Russo examined Hendrixson and opined, "The fusion is nicely assimilating and I have placed her into a soft collar.  She will return in 6 weeks with flexion/extension films[8]."  *See* Russo Aff, Ex. 2 at 7.  On November 29, 2005, Dr. Russo examined Hendrixson again and opined,

> Kathryn was seen back in the office today with flexion/extension films.  Her fusion is nicely assimilated.  She was taken out of all collars.  I don't want her returning to work until after the first of the year.  She was instructed in gentle ROM [range of motion, *see* STEDMAN'S 1637-38] exercises and will call at the end of the year to let me know how she is coming along.

Russo Aff, Ex. 2 at 3.

The parties agree that Hendrixson was released to return to work (without restrictions from Dr. Russo) in early January 2006.[9]  *See* Comp. ¶¶ 13-14; MSJ at 2, citing Hendrixson's Dep at 16 & 20.  Hendrixson alleges that she never requested any accommodations from Degussa or BASF at any time during her employment, because she never needed any.  *See* Hendrixson's Dep 53:20-

---

[8]That is, X-rays.  *See* STEDMAN'S 729.

[9]

A calendar year 2005 performance evaluation gave Hendrixson an overall rating of "Meets Expectations", the middle of the three possible ratings (the other alternatives were Exceeds Expectations and Needs Improvement).  *See* Hendrixson's Opp, Ex. 1 (2005 Performance Evaluation signed by Barney, Grusell and Hendrixson on March 22, 2006).  Similarly, plant manager Barney testified that "Mark Horton and Tom Terpstra" told her that prior to her injury, Hendrixson was an "average" employee.  Barney Dep 4:10-20.  BASF does not allege that Hendrixson performed poorly at any time prior to her June/July 2005 injury.  Nor does it allege that she performed inadequately, even *after* that injury, in any way that was unrelated to her apparent medical/physical limitations.

22.[10]

The parties agree that some time after Hendrixson returned from medical leave in January 2006, Degussa "cross-trained" her so that she could work on packaging lines for products other than the acrylic coating.  *See* MSJ at 2-3, citing Hendrixson's Dep at 15 & 20; *see also* Barney Aff ¶ 3 ("In the first quarter of 2006, I implemented a cross training system for the packager position at BCC.").  Hendrixson's new training and duties primarily included work with a "pints machine" and a "quarts machine", but she was also trained on some other machines whose name and function she could not recall.  *See* Hendrixson's Dep 20:4 to 21:4.  The pints and quarts machines required Hendrixson to "put a box on a conveyor and it filled the box up.  You slide it through, and you'd either staple or tape it shut, and then at the end of that line there would be a skid where you'd have to put those boxes."  Hendrixson's Dep 28.  Hendrixson was required to pick up the full box and move it to the skid.  Hendrixson's Dep at 28.  Hendrixson recalls *not* being trained on the Hydrozo

---

[10]

"It is well settled in cases brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, the precursor to the ADA, that reasonable accommodation is not at issue if the plaintiff has never requested accommodations."  *Gannt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 n.4 (6th Cir. 1998) (citing published decisions from 8th and 11th Circuits).

Even if this were a reasonable accommodation case, Hendrixson would fail because she would have to show that she suffered from a disability which could have been reasonably accommodated to allow her to perform the essential functions of her job as a packager for BASF – and Hendrixson contends that she does *not* have a disability.  *Cf. Stevenson v. City of Fort Wayne, Indiana*, 2006 WL 2917345, *8 n.9 (N.D. Ind. Oct. 10, 2006) ("Even if this were a reasonable accommodation case, Stevenson would fail since she would still have to show that she suffered from a 'disability' which could have been reasonably accommodated thereby allowing her to perform the essential functions of her job in the Records Division.").

Indeed, Hendrixson concedes, "The plaintiff in this case has not argued that the defendant has a duty to accommodate her because it regarded her as disabled.  That is because the Sixth Circuit has stated that there is no such duty."  Hendrixson's Opp at 19 (citing *Workman v. Frito Lay, Inc.*, 165 F.3d 460 (6th Cir. 1998)).

product line, *see* Hendrixson's Dep 21:19-24, which involved the use of a bulky hose that she elsewhere admitted she could not safely handle, *id.* 31:8-17.

BASF plant manager Barney contends that it was so useful and important to cross-train packagers that a packager's ability to move between different products' packaging lines "became . . . a key essential function of the packaging position" and "[i]t was important that all packagers be able to perform all functions of a packager at all times." Barney Aff ¶¶ 4 & 8. Barney has identified two purposes served by requiring the packagers to cross-train for different product packaging lines. First, it "allowed BCC to be responsive to market and seasons fluctuations in product demand", e.g., certain products may not be manufactured at certain times of the year or at times of low demand. Second, it "allowed BCC to provide coverage and flexibility [to adapt to] staffing changes, absences, and vacations." Barney Aff ¶¶ 6 & 7.

Plant manager Michele Barney alleges that in May 2006, Hendrixson complained to her that she was experiencing pain while performing some of her duties as a packager, *see* Barney Aff ¶ 9 and Barney Dep 5:2 to 6:7. Barney recalls Hendrixson saying that when she was "lifting the boxes of the finished product, she had pain in her back, her neck . . . she had twisted or something had pain from lifting." Barney Dep at 45. Barney acknowledges, however, that she observed Hendrixson from February through May 2006 and did not see her have any accidents while lifting quart boxes or "struggling" to lift the boxes. Barney Dep 6:13 to 7:1.

Barney also testified that she later learned that Hendrixson had expressed concern to her direct supervisor, Stephen Grusell, that she might not be able to work on the Pro 2000 line or the Kure-N-Seal line "because she could not lift the pails." Barney Dep 7:8-24 and 43-44. Barney did not document Grusell's alleged conveyance of Hendrixson's alleged complaint, however, *see* Barney

-8-

Dep 8:4-17, and Hendrixson denies that she ever made such complaints to Barney or Grusell during

that period.  *See* Hendrixson's Dep at 32.  Hendrixson also testified that she did not experience any

neck pain, let alone *recurrent* neck pain, at work in 2006, and did not tell anyone at BASF that she

was experiencing such pain in 2006:

> Q.      * * *  Did you have recurrent neck pain at work?
> A.      No.
> Q.      Again, we're in 2006.
> A.      Right.
> Q.      So you had no pain?
> A.      No pain.
>
> Q.      And you didn't tell anyone that you had any pain?
> A.      No.
>
> Q.      Okay.  And . . . you said you didn't have any symptoms, is that accurate?
> A.      Yes.

Hendrixson's Dep 36:14-24.  For purposes of this summary judgment motion only, the court assumes

that Hendrixson did not complain of pain to plant manager Barney, supervisor Grusell, or any other

BASF supervisor or manager, during the period from her post-surgery return to work (January 2006)

to her termination in July 2006.

Hendrixson testified that she never asked BASF to accommodate her in any way.  *See*

Hendrixson's Dep 53:20-24.  Hendrixson did admit, however, that on one occasion she was unable

to perform duties required of the packagers on the Hydrozo product line and that she conveyed this

to management.  Hendrixson maintains that her difficulty on that occasion was not caused by her

neck surgery or related problems:

> Q.      Okay.  Now the next paragraph [in Dr. Ilka's report or notes] says that you
>         relate the worsening of these symptoms to specific tasks where you're
>         required to hold a hose weighing about 50 or 60 pounds.  Did you tell –
>
> A.      That hose thing was bigger than I was.  It was a pain to begin with, it had

nothing to do with any of my symptoms.

Q.      Okay.
A.      And I knew exactly that day, because I went and told the guy I couldn't do it, it was bigger than me.  And when you open the valve, it was like opening up a fire hose, and I figured for everyone's safety, I wasn't the person to do this.  I could not hold that hose safe enough without spraying somebody with it.

                              * * *

A.      You basically had to hold it [the hose] with one hand, and you had to open it, because it was all connected together.
Q.      And when you opened it, product came through?
A.      Yes.

Q.      And you were asked to operate this, and you asked not to?
A.      Well, I tried it, and then I asked not to.
                              * * *
Q.      Okay.  Now, so you just felt like you were overwhelmed by having to handle that?
A.      Yeah.

Q.      But did you have any pain from trying to use it?
A.      No, I didn't have any pain from doing that.

Hendrixson's Dep 38:3 to 39:24.

        BASF also alleges that Hendrixson's ability to do certain unspecified tasks in the plant was

hampered by her self-professed claustrophobia, which made her unwilling to wear a respirator mask.

*See* Barney Aff ¶ 17.  Hendrixson does not challenge this allegation.


        What is undisputed is that on May 16, 2006, Degussa sent Hendrixson to be examined by

an occupational physician in the Village of Paw Paw, Michigan, Dr. Richard Ilka, M.D.  Ilka

examined her, performed functional testing, and restricted her to lifting no more than 25 pounds at

a time.  Comp. ¶¶ 15-17; Barney Aff ¶¶ 10-13; Hendrixson's Dep 41:7-8.  It is undisputed that

Hendrixson told Dr. Ilka that she felt tightness on the right side of her neck, where the surgery had

-10-

removed a disk and performed a fusion, when she lifted things.  *See* MSJ, Ex. 5 (May 16, 2006 typewritten report of Dr. Richard Ilka, M.D.) at 1.  Dr. Ilka's contemporaneous report also states that Hendrixson told him "[s]he also experiences pain into her right arm and tingling or numbness sensations in the fingers of the right hand.  She denies any other spinal pain."  MSJ, Ex. 5 at 1. Ilka's report also has a section entitled Assessment, which states in pertinent part, "She admits to experiencing recurrent right-sided neck pain with tingling in her fingers when she lifts as much as 50 pounds.  She is quite concerned about these symptoms related to lifting."  MSJ, Ex. 5 at 2.

But Hendrixson denies telling Dr. Ilka that she was experiencing back pain or pain, numbness, or tingling in her right arm, hand, and fingers:

Q.    [reading from Dr. Ilka's notes or report] ["]With lifting activities she gets a
      sense of pressure on the right side of her neck where a disc was removed, and
      she underwent a fusion operation.["]  Is that an accurate statement?
A.    If you mean pressure, as in tightness, then, yes.

Q.    Okay.  And this is what you told Dr. Ilka?
A.    Yes.

Q.    Okay.  And that pressure was when you were lifting.
A.    Right.

Q.    And the next sentence, again, I'll read it. ["]She also experiences pain into
      her right arm, and tingling or numbness sensations in the fingers on the right
      hand.  Is that accurate?
A.     I don't know where he got that, that happened before the surgery.

Q.    Okay.  So you did not tell him that you had pain in your right arm?
A.    No, because I didn't have any pain.

Q.    And you didn't have any numbness?
A.    No.
Q.    Or tingling.
A.    No.

Q.    Okay.  And you didn't have any other back pain?
A.    No.

> Q.      You did not have any other back pain, correct?
> A.      Yes.

Hendrixson's Dep 36:25 to 37:25.  After Hendrixson's examination by Dr. Ilka, she went back to work.  Hendrixson's Dep 41:9-11.  For purposes of this motion, the court accepts Hendrixson's version and assumes that she told Dr. Ilka that she sometimes experienced "tightness" in the right side of her neck when she lifted things, but did not tell him that she experienced pain, numbness, or tingling in her right arm, hand, or fingers.

Hendrixson's work after the Dr. Ilka exam differed from her pre-exam work in two respects. First, before the exam, Hendrixson had been loading the "pints", "quarts", and Ucrete machines, but after the exam she was assigned only to *un*-loading those machines.  Second, before the exam BASF had been training Hendrixson to work on other product lines or machines, but after the exam it assigned her to work only on the pints and quarts machines:

> A.      Basically I went from basically loading the machine to unloading the machine, that's the only difference.  I only ran the quarts machine and the pints machine, and occasionally the Ucrete, only if somebody was there with me.  But I was still lifting, if that's what you, if that's what the question is.
>
> Q.      All right.  So let's back up.  You continued working with those tubes?
> A.      Yes.
>
> * * *
>
> Q.      But it was after that that you were restricted to using that one machine?
> A.      The two, yeah, basically.
> Q.      Okay.
> A.      And I wouldn't say restricted, because it was wherever I was put, that just happened to be where I was at.  Like I said, I didn't question where I went, I just went there.
>
> Q.      But you were on that machine every day?
> A.      Basically, yes.
> Q.      As opposed to the cross-training?
> A.      Right.

Hendrixson's Dep 41:13-24 and 48:2-12.

-12-

Barney alleges that Dr. Ilka communicated the 25-pound lifting restriction to her, *see* Barney Aff ¶ 11 and Barney Dep 19:16-22, but Hendrixson expresses skepticism toward that allegation.

Barney alleges that in June 2006, she communicated with Dr. Ilka "to get a better understanding of what the restrictions [sic, plural] meant." Barney Aff ¶¶ 14-15. BASF submits a one-page letter from Barney to Dr. Ilka dated June 20, 2006, along with a one-page "Packaging Weight Analysis" describing "various jobs that an employee may be assigned to during an 8-hour shift." *See* MSJ, Ex. 7. Barney's alleged letter to Dr. Ilka states, in its entirety,

> I am writing in reference to our employee, Katherine Hendrixson, whom we sent to you for a fitness for duty evaluation. The latest information that I received from you indicate a 25 lb. maximum lifting restriction when a safety factor of 10 lbs. is used.
>
> As a Packager in our facility, Kay is required to package and lift various sizes of boxes and pails during the course of her shift. The exact packaging function can vary from day to day. I have attached a list of our major packaged products, their weights, and the average number [of] packages lifted in an 8 hour shift. Could you please review this list and based upon your knowledge of Ms. Hendrixson's medical condition tell me which, if any, items that she could safely lift within her 8 hour shift?
>
> You may reach me at . . . .

MSJ, Ex. 7 at 1. The alleged attachment to the Barney-Ilka letter reads as follows, in its entirety:

**Degussa Construction Chemicals Operations Inc.**
**Mattawan Plant**

**Packaging Weight Analysis**

| Packaged Product | Weight | Avg # Per 8 hr Shift | Total Weight Per Shift |
|---|---|---|---|
| OSI Qts | 28.6 | 660 | 18,850 |
| OSI Pints | 10.4 | 1000 | 10,370 |
| Lepage Pints | 17.6 | 600 | 10,572 |
| Lepage Qts | 29.9 | 660 | 19,714 |
| CX 948 Qts | 29.9 | 660 | 19,714 |
| CX 948 Pts | 21.7 | 500 | 10,835 |

| | | | |
|---|---|---|---|
| CX 941 5 gal | 53.4 | 180 | 9,605 |
| Pro 2000 | 15.7 | 250 | 3,913 |
| Kure N Seal 25 LV | 37.0 | 310 | 11,470 |
| Hydrozo | 34.6 | 291 | 10,054 |
| Acrylic Coatings Avg | 45.0 | 500 | 22,500 |
| Ucrete HF Pt 1 ½ | 27.4 | 240 | 6,574 |
| Ucrete HF Pt 2 ½ | 24.0 | 240 | 5,760 |
| Ucrete MF HP 1 gl | 25.2 | 113 | 2,851 |
| Ucrete MF HP pt2 | 27.0 | 113 | 3,051 |
| | | | |
| **Avg** | **28.5** | | |

**The above represents various jobs that an employee may be assigned to during an 8 hour shift.**

| | |
|---|---|
| **Weight of Box of Qt Tubes** | **32 lbs** |
| **Weight of Box of Pint Tubes** | **45 lbs** |

MSJ, Ex. 7 at 2 (boldface in original, commas added in numbers). Although the document does not specify the units of measurement, the court assumes that all weights are measured in pounds.

According to Barney, Dr. Ilka responded to her inquiry by opining that "at a maximum, Plaintiff could only safely perform job duties which required lifting less than 25 pounds." Barney Aff ¶¶ 14-15. Barney also alleges that Dr. Ilka "expressed concern about some of the lower[-]weight job duties as well" – presumably, Barney is referring to weights less than 25 pounds – "because of the frequency with which Plaintiff had to lift those amounts." Barney Aff ¶ 16.

BASF acquired Degussa on July 1, 2006 and terminated Hendrixson's employment, contending that she could not perform the essential functions of her job as a machine operator. Comp. ¶¶ 19-21. Hendrixson was 37 years old. *See* Russo Aff, Ex. 2 (Aug. 22, 2005 letter from Russo to Cabras shows birthdate Dec. 20, 1968). Hendrixson maintains that at the time of her termination, she was performing the essential functions of her job with little or no assistance and accommodation, and was able to continue doing so. Comp. ¶ 22. BASF maintains that it could not

-14-

accommodate the restrictions that Hendrixson's health problems placed on her job performance.

Ans. ¶ 21.  Plant manager Barney explains,

> Based on the restrictions imposed by Dr. Ilka, and because Ms. Hendrixson was
> unable to wear a respirator (she said she is claustrophobic), the only job that she
> could have safely performed was the case packer job.  If that line were not running,
> there would have been nothing for Ms. Hendrixson to do.  In addition, since the case
> packer position is the least skilled position in the plant, we can staff it with
> temporary workers when necessary.

Barney Aff ¶ 17.

Plant Manager Barney testified that in July 2006 (the same month when BASF terminated

Hendrixson), she participated in a telephone conference call with BASF Human Resources personnel

and Director of Manufacturing Gary Pierce to discuss Hendrixson.  The participants discussed their

concern that Hendrixson might injure herself again and file a claim for worker's compensation

benefits.  According to Barney, BASF decided to terminate Hendrixson because they credited Dr.

Ilka's report that she should not be lifting over 25 pounds.  Hendrixson's Opp at 4, citing Barney

Dep at 21-35.  Hendrixson's opposition brief states that BASF has not presented any affidavit,

deposition testimony, or report from Dr. Ilka verifying *that he told BASF, prior to their termination*

*of Hendrixson*, that she should not lift over 25 pounds.  *See* Hendrixson's Opp at 13.

## PROCEDURAL HISTORY

Hendrixson filed the complaint in May 2007 and BASF filed an answer in June 2007.  The

complaint contains only one numbered count, but it asserts two claims: one under the ADA and the

other under a Michigan state statute.  The case was reassigned from then-Chief Judge Bell to this

judge by administrative order no. 07-091 on August 10, 2007.  BASF timely moved for summary

judgment in April 2008, Hendrixson filed an opposition brief on May 12, and BASF filed a reply

brief on May 23.

## LEGAL STANDARD: SUMMARY JUDGMENT

Summary judgment is proper if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Appalachian Railcar Servs., Inc. v. Consumers Energy Co.*, – F. Supp.2d –, 2008 WL 828112, *13 (W.D. Mich. Mar. 25, 2008) (Maloney, J.) ("ARS") (quoting *Conley v. City of Findlay*, 266 F. App'x 400, 405 (6th Cir. 2008) (Griffin, J.) (quoting FED. R. CIV. P. 56(c))).  The court is not to weigh the evidence or decide the truth of the matter.  *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council*, – F.3d –, –, 2008 WL 2699923, *5 (6th Cir. July 8, 2008) (citing *Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local No. 24*, 357 F.3d 546, 551 (6th Cir. 2004)).

The movant  has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citing *Conley*, 266 F. App'x at 404 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  However, the movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, the movant's initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . ."  *Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (Bell, J.) (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. Nov. 2, 2000).

Once the movant has met its burden, the non-movant must present "significant probative evidence" to demonstrate that there is more than "some metaphysical doubt as to the material facts." *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citing *Conley*, 266 F. App'x at 404 (quoting *Moore*, 8 F.3d at 339-40)).  The non-movant may not rest on the mere allegations of his pleadings.

-16-

*Wilson*, 112 F. Supp.2d at 654 (citing FED. R. CIV. P. 56(e) and *Copeland v. Machulis*, 57 F.3d 476,

479 (6th Cir. 1995)).  Moreover, the mere existence of an alleged factual dispute between the parties

will not defeat an otherwise properly supported summary judgment motion; there be some genuine

issue of *material* fact.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citing *Conley*, 266 F. App'x

at 404 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986))).

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644,

691 (6th Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)),

*cert. denied*, – U.S. –, 128 S. Ct 1334 (2008), and view the evidence in the light most favorable to

the non-movant, giving it the benefit of all reasonable inferences.  *Fox v. Eagle Dist. Co., Inc.*, 510

F.3d 587, 592 (6th Cir. 2007) (Richard Allen Griffin, J.).

Ultimately, "summary judgment is appropriate 'against a party who fails to make a showing

sufficient to establish the existence of an element to that party's case, and on which that party

w[ould] bear the burden of proof at trial.'"  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citing

*Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 447 (6th Cir. 2007) (quoting *Celotex*, 477 U.S. at

322)).[11]  As former Chief Judge Robert Holmes Bell aptly characterized the post-trilogy summary-

---

[11]

A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior
precedent, the use of summary judgment is not only permitted but encouraged in certain
circumstances . . . ."  *Collins v. Assoc'd Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7th Cir. 1988).
*Accord In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) (the trilogy
"encourage the use of summary judgment as a means to dispose of factually unsupported claims.");
*Hurst v. Union Pacific Rail Co.*, 1991 WL 329588, *1 (W.D. Okla. Feb. 6, 1991) ("This trilogy of
cases establishes that factual and credibility conflicts are not necessarily enough to preclude
summary judgment and encourage that a summary judgment be used to pierce the pleadings and
determine if there is in actuality a genuine triable issue."), *aff'd*, 958 F.2d 1002 (10th Cir. 1992);
*Bowser v. McDonald's Corp.*, 715 F. Supp. 839, 840 (S.D. Tex. 1989) (the trilogy "encouraged
federal district courts to use summary judgment more frequently and economically by changing the
movant's burden of production . . . and by allowing qualitative review of evidence") (citations
omitted).

-17-

judgment standard, "[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, *the courts are now vigilant to weed out* fanciful, malicious, and *unsupported claims before trial*." *Wilson*, 112 F. Supp.2d at 654 (emphasis added); *see also Townsend v. US*, 2000 WL 1616081, *1 (W.D. Mich. Aug. 31, 2000) (McKeague, J.).

## LEGAL STANDARD:  ADA

The ADA provides that

> [n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

To prevail in an ADA disability-discrimination claim, the plaintiff typically must show that (1) she was "disabled" as defined by the ADA; (2) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; (3) she suffered an adverse employment action; (4) the employer knew or had reason to know of her disability; and (5) a non-disabled person replaced her.  *Nance v. The Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 (6th Cir. 2008) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)).

An individual is considered "disabled" under the ADA if she (1) has a physical or mental impairment that substantially limits one or more of her major life activities, or (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment.  *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999) and 42 U.S.C. § 12102(2)(A)-(C)).

According to Equal Employment Opportunity Commission ("EEOC") regulations promulgated pursuant to the ADA, one is substantially limited if she is "unable to perform a major

-18-

life activity that the average person in the general population can perform" or if she is

> significantly restricted as to the condition, manner or duration under which an
> individual can perform a particular major life activity as compared to the condition,
> manner, or duration under which the average person in the general population can
> perform that same major life activity.

*Bryson v. Regis Corp.*, 498 F.3d 561, 575 (6th Cir. 2007) (quoting *Toyota Motor Mfg. of Ky., Inc. v.*

*Williams*, 534 U.S. 184, 195-96 (2002) (quoting 29 C.F.R. § 1630.2(j))).  This standard excludes

impairments that "'interfere in only a minor way . . . from qualifying as disabilities.'" *Bryson*, 498

F.3d at 575 (quoting *Toyota*, 534 U.S. at 196); *see also Mahon v. Crowell*, 295 F.3d 585, 590-91 (6th

Cir. 2002) (an "impairment that only moderately or intermittently prevents an individual from

performing major life activities is not a substantial limitation" under the ADA).

       An activity constitutes a major life activity if it is of central importance to daily life.  *Bryson*,

498 F.3d at 575 (quoting *Toyota*, 534 U.S. at 196), and our Circuit holds that work is such an

activity.  *See Doe v. Salvation Army in US*, – F.3d –, –, 2008 WL 2572930, *2 (6th Cir. 2008) (Ryan,

J.) (referring to "the major life activities of self-care, thinking, learning, and working"); *Thomas v.*

*Avon Prods., Inc.* – F. App'x –, –, 2008 WL 1987140, *1 (6th Cir. 2008) (referring to "the major life

activity of working").

       The Supreme Court cautions, however, that "[t]he inability to perform a single, particular

job does not constitute a substantial limitation in the major life activity of working." *Bryson*, 498

F.3d at 576 (quoting *Sutton*, 527 U.S. at 493) (holding that petitioner's poor eyesight did not

substantially limit their ability to work, even if it precluded them from working as airline pilots)).

Rather, a regarded-as-disabled plaintiff must show that her employer erroneously regarded her

impairment(s) as "'significantly restrict[ing her] ability to perform either a class of jobs or a broad

range of jobs in various classes.'" *Bryson*, 498 F.3d at 576 (quoting 29 C.F.R. § 1630.2(j)(3)(I));

*see, e.g., Bryson*, 489 F.3d at 576 (affirming summary judgment for employer on ADA discrimination claim where evidence might support a finding that her impairment (following knee surgery) prevented her from working as manager of the hair salon Supercuts, but "[s]he has not established that her medical condition bars her from working in all jobs within the cosmetology field, or that it prevents her from holding a large number of jobs in other categories of employment") (citing *Olds v. UPS, Inc.*, 127 F. App'x 779, 782 (6th Cir. 2005) (affirming summary judgment for employer where the plaintiff's "lifting restriction prevents him from working as a delivery driver and from performing other jobs at UPS specifically, but there is no evidence in the record that it prevents him from engaging in a broad class of jobs")).

Once the plaintiff establishes a prima facie case of disability discrimination under one of 42 U.S.C. § 12102(2)'s three prongs, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Nance*, 527 F.3d at 553 (citing *Monette*, 90 F.3d at 1186). If the defendant articulates such a reason, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for illegal disability discrimination. *Nance*, 527 F.3d at 553 (citing *Monette*, 90 F.3d at 1186). The plaintiff need not show directly that the illegal motivation was the actual reason for the adverse action; instead, she may challenge the credibility of the employer's explanation, thereby creating an inference that the real reason was the unlawful one. *Oil, Chemical & Atomic Workers Int'l Union, Local 7-629, AFL-CIO v. RMI Titanium Co.*, 199 F.3d 881, 889 (6th Cir. 2000) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1094 (6th Cir. 1994)).

"To show pretext, [the plaintiff] 'must submit evidence demonstrating that the employer did not honestly believe in the proffered non-discriminatory reason for the adverse action.'" *Scott v.*

*Metropolitan Health Corp.*, 234 F. App'x 341, 352 (6th Cir. 2007) (Griffin, J.) (quoting *Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005)).  To inquire into the defendant's honest belief, the court looks to whether the employer can establish "reasonable reliance" on the particularized facts that were before the employer when it decided to take the adverse action.  *Id.*  As our Circuit recently stated:

> If there is no reasonable dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.

*Id.*

Although the burdens of production shift, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Nance*, 527 F.3d at 553 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

On a motion for summary judgment, the court considers whether there is sufficient evidence to create a genuine dispute of material fact at each stage of the *McDonnell Douglas* burden-shifting inquiry.  *Nance*, 527 F.3d at 553 (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

### DISCUSSION:  Hendrixson's ADA Claim

It is undisputed that BASF terminated Hendrixson's employment, and termination is the quintessential adverse employment action.  It is also undisputed that BASF replaced Hendrixson with an employee who was not disabled or perceived to be disabled.  *See* Hendrixson's Opp at 4, citing Barney Dep at 156-57.  Accordingly, those two elements of the *prima facie* case of ADA disability discrimination are satisfied.

-21-

Turning to what is usually the first element of a prima facie case of ADA disability discrimination, the court begins by noting that Hendrixson does *not* allege that she was disabled when BASF terminated her employment.  On the contrary, Hendrixson insists that she was not disabled but that BASF terminated her employment "because it [erroneously] perceived or regarded her as disabled or because she had a history or record of having a disability[,] or both[,] even though she was not disabled and she was actually able to do her job."  Hendrixson's Opp at 1.[12]

The ADA's prohibition on regarded-as-disabled discrimination "protects employees who are 'perfectly able' to perform a job, *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001), but are 'rejected . . . because of the myths, fears and stereotypes associated with disabilities.'" *Gruener*, 510 F.3d at 664 (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-90 (1999) (quoting 29 C.F.R. Part 1630, App. § 1630.2(l))).  An employer commits regarded-as-disabled discrimination when it takes an adverse employment action based on its mistaken belief that the employee has a physical or mental impairment that substantially limits a major life activity *or* its mistaken belief that the employee's actual, non-substantially-limiting impairment substantially limits a major life activity.  *Gruener*, 510 F.3d at 664 (citing *Sutton*, 527 U.S. at 489).  Either type of regarded-as-disabled discrimination requires that the employer "entertain misperceptions" about the employee.

---

[12]

Hendrixson makes clear that she "has not argued that the defendant had a duty to accommodate her because it regarded her as disabled.  That is because the Sixth Circuit has stated that there is no such duty."  Hendrixson's Opp at 19 (citing *Workman v. Frito-Lay, Inc.*, 165 F.3d 460 (6th Cir. 1998)).  *Cf., e.g., Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007) (an employer has a duty under the ADA to consider transferring an employee who can no longer perform his old job even with accommodation to a new position for which he is otherwise qualified; the employer here, however, did not violate that duty by failing to accommodate a production employee with a head injury by placing him in another position, because there was no evidence that the employer continued to hire new production workers or accept applications for such positions during the relevant time period).

-22-

*Gruener*, 510 F.3d at 664 (citing *Sutton*, 527 U.S. at 489).

Hendrixson explains that her job as packager consisted of picking up buckets that weighed 25 to over 50 pounds from the floor, loading them onto a platform, pressing a button to allow the buckets to fill with paint, sliding the buckets onto a conveyor, sealing the buckets, and restacking the buckets on a pallet at the end of the line. Hendrixson's Opp at 1, citing Ex. 1 (Hendrixson's Dep) at 13-18 and 22-31 and Ex. 2 (Barney Dep) at 35-38 and 86. Hendrixson states that in late June or early July 2005, "while pulling buckets apart at work, [she] felt a burning sensation in her neck. It was extremely painful, and she suffered radiculopathy, numbness and tingling in her right arm and hand." Hendrixson's Opp. at 1. Hendrixson further admits that "[t]hese problems incapacitated her from lifting or working" and she consequently "left work, saw physicians and was placed on a short disability leave for 5-6 months." Hendrixson's Opp. at 1.

According to Hendrixson, in August 2005 Dr. Harris Russo, M.D., took X-rays and diagnosed a large cervical-disk herniation in her neck, and on September 8, 2005 he performed "an anterior cervical decompression and bone graft fusion surgery" on her neck. Dr. Russo then precluded Hendrixson from work so that she could recover and heal from the surgery. *See* Russo Aff, unnumbered ¶¶ 4-5; *see also* Hendrixson's Opp at 1-2, citing Ex 1 (Hendrixson's Dep) at pp. 16-17 and 37-38, Hendrixson Aff (no page citations), Russo Aff (no page citations), and Barney Dep at pp. 10-16, 33-40, and 105-111.

On January 3, 2006, Dr. Russo stated that Hendrixson could return to work with no restrictions. Russo Aff, unnumbered ¶ 6 and Ex. 1. Russo states,

> It is normal for a person after surgery to have some tightness or discomfort in the area of the surgery, as she grows accustomed to using the part of the body in question. Ms. Hendrixson recovered well after her surgery, however, and I did not feel there were any significant risks to Ms. Hendrixson of performing her job

> functions beyond that encountered by the normal person who did not have surgery
> on the part of the body in question.

Russo Aff, unnumbered ¶ 7.  On that date, Hendrixson returned to her job as a packager, performing

all the same tasks as she had before her injury and surgery, including the required lifting, and never

had difficulty due to the weight of the items that she lifted.  Hendrixson concedes that she had

difficulty lifting a hose, but states that the difficulty was caused by the hose's unwieldiness, not its

weight.[13]  Hendrixson cites the testimony of plant manager Michelle Barney that she saw

Hendrixson doing her job and never received reports from her supervisors that she was not doing

her job.  *See* Hendrixson's Opp at 2, citing Russo Aff (no page citations) and Hendrixson's Dep at

pp. 16-31, 38-39 and 52-53 and Barney Dep at pp. 38-45, 98 and 114.

It is undisputed that at some time shortly before Hendrixson's May 2006 termination, plant

manager Michelle Barney assigned her to work exclusively on a case packer machine, where she

remained until her termination.  *See* Barney Dep at 53; Hendrixson's Dep at 48; .  (BASF alleges,

without contradiction from Hendrixson, that "[b]y moving Plaintiff to the case packer machine, a

temporary worker was displaced."  MSJ at 4, citing Barney Dep at 50.)  Working the case packer

machine generally required her to lift only 10-20 pounds, compared to 25-50 or even more in her

other tasks as a packager.  BASF explains, without contradiction by Hendrixson, that "[w]orking

---

[13]

Dr. Ilka, the occupational physician who examined Hendrixson in May 2006, has a contrary recollection.  Ilka's contemporaneous examination report states, in a section entitled Symptoms, "*She relates the worsening of these symptoms to a specific task where she is required to hold a hose weighing about 50-60 pounds in her right hand and then operate a handle with the other.*  The pain has been severe enough that she has had to rely on Vicodin [a narcotic] and Motrin.  It is intermittent."  MSJ, Ex. 5 at 1 (emphasis added).  Because Hendrixson is opposing summary judgment, the court must accept her version as true at this juncture.  The court assumes that Hendrixson never told Dr. Ilka that her pain or other symptoms were caused or exacerbated by the task involving the large hose.

on the case packer machine is only one of the many duties of packagers at [BASF] and requires less lifting than other duties normally assigned to packagers."  MSJ at 4, citing Barney Dep at 49-52. "The case packer [function] involves lifting bundles of corrugated boxes, taking each individual box, opening it up and placing it on a shoe, so to speak . . . solvent-based adhesive tubes are then automatically filled into the box, and the box then is dropped down and sealed up and goes down a conveyor to be palletized [sic]."  Barney Dep at 49.  On deposition, a co-worker describes the case packer's job in a manner that shows it to be generally less physically strenuous than other packager functions that are described in the record:

> Q.    What types of things was she doing as a case packer?
> A.    Putting the box up on the machine – it's kind of a little hard to explain. Umm, at the case packer where she was, you would put the box up, and then the machine would shoot the tubes out and it would lower down, and then you'd fold the flaps and send it through the taper.
>
> Q.    What's the "it" that's sent through the taper?
> A.    The completed –
> Q.    Box?
> A.    (Continuing) – product, yes.
>
> Q.    So the tubes were being shot into the box?  Is that correct?
> A.    Not shot.  They're pushed.
> Q.    They're pushed into the box.
> A.    Yes.  And then once that's full, there's an arm that with the weight of the box comes down, and then you fold it.
>
> Q.    Okay.  *Now, would the case packer actually shove the tubes into the box or not?*
> A.    *There is an arm.  It's a – yeah, and it pushes the tubes into the box (indicating).*
> Q.    *So it's a mechanical arm –*
> A.    *Yeah.*
> Q.    *– that pushes the tubes into the box.*
> A.    *Yes.*
> Q.    *The case packer actually does not do the pushing; is that correct?*
> A.    *Oh, no.*

-25-

Q.      *All right.  And is there any lifting involved in that position?*
A.      Getting the boxes, um, the empty bundles of boxes, so that way you can fold them and get ready to put on the case packer.  And on the end for the finished box, we would lift them up and put them on the skid.

                                    * * *

A.      That's the case packer part.

Q.      All right.  It sounds like the lifting involved, then, would be initially lifting the boxers up onto the, what is it, a conveyor or something like that?  Or a movable line?  Describe what it is for me where the boxes are put when the arm comes down and shoves the tubes in.
A.      You mean the empty boxes?
Q.      Yes, the empty boxes.
A.      Actually, it's on a table. * * *  That way, we can have them ready to grab.

                                    * * *

Q.      *Okay.  So it sounds like the lifting involved for the case packer would be lifting the box into place, the empty box; is that correct?*
A.      *Yes.*
Q.      Okay.  *And how much do those empty boxes weigh?  * * ***

                                    * * *

Q.      *Less than ten pounds?*
A.      *Oh, definitely.*

                                    * * *

Q.      [A]fter the box is filled with the tubes, what happens when?
A.      And it comes down from the arm?
Q.      Correct.
A.      The person would then fold the flaps, and there's a conveyor that takes it to the taper – * * * – so it can be taped.  *And then there's roller line.  So all that person at the case packer has to do is fold the flaps.*

Q.      Okay.  And then what – the box is on a conveyor, and then you said there's a roller line?
A.      After the taper.

Q.      Okay.  What happens to the box on the roller line/
A.      It rolls down to the end. * * * To where the skid is.

Q.      And what happens when the box is rolled down to the end where the skid is?
A.      After so many's on the line, we would – the operator or the lineman would then take the boxes off the line and put them on the skid.

Deposition of Francis Korteway dated March 6, 2008 ("Korteway Dep") 10:2 to 11:24 and 13:11-21

and 14:12 to 15:8 (emphasis added).

                                    -26-

Barney testified that she transferred Hendrixson because she had complained to her that she had experienced neck or back pain while lifting buckets.  MSJ at 4, citing Barney Dep at 49.  In contrast, Hendrixson testified that she did not complain about pain or problems associated with lifting at any time between her January 2006 post-surgery return and her May 2006 reassignment to the case packer job.  Hendrixson's Opp, citing Hendrixson's Dep at pp. 16-33 & 52-53.

Also in May 2006, shortly after plant manager Barney assigned to the case packer machine and stopped having her perform any other functions, she referred to a document stating that a packager lifts products weighing up to 53.4 pounds and sent Hendrixson to a Dr. Ilka for a fitness-for-duty examination.  Hendrixson's Opp at 3, citing Barney Dep at pp. 45-46 and 60-61 and Hendrixson's Dep at pp. 22-28.  Hendrixson alleges that she told Dr. Ilka that she expressed general concern about her neck and reported that lifting caused her tightness in her neck, but she did not state that she had limitations on her ability to lift or that lifting caused her pain.

On Dr. Ilka's recommendation and referral, Hendrixson went to a physical therapist, who had her lift boxes to determine her physical capacity.  Hendrixson's Opp at 3, citing Hendrixson's Dep at 36-38 and 45-46, Hendrixson Aff (no paragraph citations), and Barney Dep at 26-27.  At some unspecified time – Hendrixson's brief does not specify whether it was before or after the physical therapist test – Dr. Ilka told plant manager Barney that Hendrixson should be subject to a 25-pound lifting restriction.  *See* Hendrixson's Opp at 3, citing Barney Dep at pp. 26-31, 61-65, and 119-122.  Ilka's report from the May 16, 2006 examination states:

> ASSESSMENT:  * * *  The requirement to lift 50 pounds continuously is one which only fit employees would be able to do without serious risk of injury.  In her case, she has impairments related to her surgical treatment and the original neck condition. It is my opinion that she is not physically fit to lift 50 pounds on a regular basis, let alone the occasional requirement of 80-90 pounds.

This raises the question of what should be her restrictions.  On an interim basis to protect her from imminent injury, I would set these at 25 pounds.  Further, I suggest that she have formal functional testing at our physical therapy clinic to better delineate her tolerance.

PLAN: Accordingly, she is returned to work on a maximum lifting restriction of 25 pounds.  I note that one of the problems with the hose operation was that it was an asymmetrical lifting with the weight actually held by her right arm.  I suggest that this type of more hazardous lifting be avoided as well.  These restrictions are suggested for a personal orthopedic condition and not in recognition of an occupational injury.  When the functional testing is available, I should be pleased to provide an addendum to this report.

MSJ, Ex. 5 at 2.  On an unspecified date, Dr. Ilka added a short handwritten note to the bottom of his May 16, 2006 report.  The addendum states, in its entirety, "addendum: functional testing on 5-22-07 [presumably with the physical therapist] confirms 25 lb. max lifting restriction when a safety factor of 10 lb is used."  MSJ, Ex. 6.

From May 2006 until her termination on July 20-21, 2006, Hendrixson alleges that she performed all the duties of the case packer machine, including lifting, with no problems.  Plant manager Barney testified that she saw Hendrixson working and that nobody had reported that she was not doing her job as a case packer.  *See* Hendrixson's Opp at 3-4, citing Hendrixson's Dep at pp. 41-43, 47-48, 52-53 and Barney Dep at pp. 49 through 55, pp. 60-61, and p. 64, and Kortaway Dep at 8-16.  But Hendrixson begs the question, did the ADA require BASF to continue her employment merely because she could safely and effectively work the case-packer machine, if it had competent medical opinion, or her own admission, that she could not safely perform *other* tasks that are an essential part of the packager position?  As a matter of law, the answer is "no", the ADA did not require BASF to continue Hendrixson's employment (with or without  the case-packer accommodation) under these circumstances.

If an ADA plaintiff opposing summary judgment makes out a *prima facie* case of disability

discrimination, the burden shifts to the employer to articulate a lawful reason for the adverse

employment action; if the employer does so, the burden shifts back to the plaintiff to show a genuine

issue as to whether the stated lawful reason was a pretext for unlawful disability discrimination.  *See*

*Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 417-18 (6th Cir. 2004) (citations omitted).

       BASF has articulated a lawful reason, supported by undisputed evidence in the record, for

terminating Hendrixson's employment (her acknowledged inability to perform some essential

functions of the job).  As discussed below, Hendrixson has not shown a genuine issue as to pretext.

Therefore, there is no need to determine whether she has made out a *prima facie* case.  *See*

*Washington v. Comcast Corp.*, 268 F. App'x 423, 429-30 (6th Cir. 2008) (Griffin, J.) ("Even if we

were to find that Washington has established a prima facie case, she has not rebutted as pretextual

Comcast's explanation."); *Scott v. Metropolitan Health Corp.*, 234 F. App'x 341, 352 (6th Cir. 2007)

(Griffin, J.) ("Scott cannot prove pretext to a reasonable factfinder. * * *  In view of our disposition,

we need not address whether Scott made out a prima facie case of retaliation."), *cert. denied* – U.S.

–, 128 S.Ct. 1225 (2008).[14]

_____

14

     *See also Alfrey v. AK Steel Corp.*, 211 F. App'x 393, 396 (6th Cir. 2006) (McKeague, J.)
("Because Alfrey cannot show pretext, the court need not reach the question of whether he
established a prima facie case.") (footnote omitted);

     *Scott v. FirstMerit Corp.*, 167 F. App'x 480, 487 (6th Cir. 2006) (Sutton, J.) ("It is unclear
. . . whether Scott has established a prima facie case of disability discrimination. * * * [H]owever,
we need not rest our resolution of the appeal on this ground.  Even if she had established a prima
facie case, Scott has not met her burden of establishing that FirstMerit's proffered nondiscriminatory
justification was a pretext for discrimination . . . .");

     *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997) ("[W]e will assume that a prima facie
showing [of ERISA discrimination] has been made, as it is clear that plaintiff has failed to show that
defendant's alleged non-discriminatory was pretextual."), *quoted by Walsh v. UPS*, 201 F.3d 718,
729 (6th Cir. 2000).

An employment-discrimination plaintiff has three alternative avenues for showing pretext. She must show by a preponderance of the evidence that the proffered lawful reason for her termination (1) had no basis in fact, or (2) did not actually motivate the termination, or (3) was insufficient to motivate the termination. *Allen v. City of Sturgis*, – F. Supp.2d –, –, 2008 WL 2345942, *8 (W.D. Mich. June 5, 2008) (Maloney, J.) (citing *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 120-21 (6th Cir. 2007) (Griffin, J.) (citing, *inter alia*, *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 728 (6th Cir. 2007))).

The first of the three avenues for showing pretext is foreclosed by Hendrixson's own testimony. Namely, Hendrixson cannot argue that the proffered reason for her termination – her inability to perform all essential functions of the packager job – had no basis in fact, because she has admitted that she was unable to perform at least one of those essential functions. *See* Hendrixson's Dep 38:7-15 ("That hose thing was bigger than I was. It was a pain . . . . And I knew exactly that day, because *I went and told the guy I couldn't do it*, it was bigger than me. And when you open the valve, it was like opening up a fire hose, and *I figured for everyone's safety,*[15] *I wasn't the person to do this. I could not hold that hose safe enough without spraying somebody with it.*") (emphasis added); *id.* at 38:12 ("Well, I tried it, and then I asked not to."); *id.* at 39:20-22 (agreeing that she

_____

[15]

This admission defeats Hendrixson's argument that

under the ADA, an employe[r] may only refuse to employ an individual with a disability or a perceived disability if she constitutes a 'direct threat' to herself or the health and safety of others in the workplace. 42 U.S.C. § 12113(b); 29 C.F.R. § 1630.2(r) . . . . [T]he determination of whether an individual poses a direct threat is generally a jury question. [citation to 5th Circuit decision omitted] The defendant has not submitted any evidence of a direct threat, and certainly no verified evidence.

Hendrixson's Opp at 14.

had felt "overwhelmed by having to handle" the hose function).

The third of the three avenues for showing pretext is also foreclosed.  Namely, if Hendrixson truly was unable to perform any essential function of the packager job, that was certainly sufficient – in theory – to motivate BASF to terminate her employment.

Finally, the second of the three avenues for showing pretext is also not available to Hendrixson on this record.  Namely, she has not shown a genuine issue as to whether BASF's stated lawful reason – inability to perform some essential functions of the packager position – *actually* motivated the termination of her employment.  It is undisputed that a packager's essential and expected duties include far more than the operation of a case-packer machine.  To begin with, the formal, written description of the packager position contains no such limitation.  The packager job description issued on January 1, 2005 reads, in its entirety:

**Job Title:**                  **Packager**
**Reports To:**             **Production Leader**
**Number of Direct Reports:  0**
**FLSA:**                       **Non-Exempt**

**Job Summary:**
This position has the knowledge and demonstrates the ability to operate state of the art packaging equipment.  Individual will interface with equipment controls to package finished product. Individual will operate packaging line while loading units to be packaged and preparing finished product for delivery or warehousing. Operator will take corrective actions when nonconformance occurs.  May perform work on various packaging lines to ensure the timely production of products.  Individual must be willing to work as a team member.  Individual must be willing to lift 50 pounds throughout the shift.  Maximum lifting requirements are 80-90 pounds and must be able to push and pull up to 100-150 pounds.  Work within a confined space is required and the position will work with chemicals.

**Duties and Responsibilities:**
● 	Responsible for packaging finished product.

● 	Labels product.

-31-

- Prepares product for shipment.

- Responsible for assuring quality work and appearance of finished product packaging.

- Completes all necessary paperwork in an accurate and timely manner.

- Efficiently operate equipment ensuring timely completion of quality products per production schedule. Minimize and rework scrap material.

- Trouble shoot [sic] equipment and process difficulties, taking corrective action to prevent the loss of material or production time. Communicate with other operators and maintenance personnel when difficulties arise.

- Maintain housekeeping at excellent levels, keeping the mixers, floor, mixing deck and pigment pump area clean.

- *Cross train and assist in other functions when necessary.*

- Wear necessary safety equipment and follow company[-]established Safety, Health and Environmental policies and procedures.

- Maintain good attendance record and report to assigned job station in a timely manner.

- *Performs other duties as required.*

- Follow all appropriate Environmental Protection, Safety, Health and Quality (ESHQ) policies.

- Wears prescribed Personal Protective Equipment and ensures that prescribed safeguards are properly used.

- Notifies his/her supervisor before undertaking a work activity in which he/she is not adequately trained.

- Immediately reports unsafe acts or conditions to his/her supervisor and takes immediate interim steps to protect himself/herself and others from serious risk.

- Understands that Safety and Environmental responsibility is a major part of Degussa's Vision and Guiding Principles. Must report all unsafe conditions and accidents immediately to appropriate managers or directors. Responsible for the safety of themselves and others.

- Must understand and follow all quality initiatives and processes for ISO 9000, ISO 140000 and other ISO regulations, procedures and processes as they pertain to job responsibilities.

**Experience:**
Must have 1-2 years experience within the manufacturing environment and demonstrate mechanical reasoning skills.  Must have good math, reading, writing and communication skills.  The position must consult with QC [quality control?], experienced mixing operators and packaging operators or production supervisor when difficulties arise.

**Education:**
Position requires a high school diploma or equivalent.

**Comments (list any unique circumstances for this position that differentiate this job from others):**  [nothing typed or written in the blank space provided]

MSJ, Ex. 3 at 1-2 (emphasis added).  Hendrixson has not alleged that this job description was issued on a date other than the stated issue date of January 1, 2005.  Nor has she alleged that Degussa/BASF modified the job description at any time after its issuance in order to prepare for or justify her termination or otherwise assist in BASF's defense of an actual or potential lawsuit by Hendrixson.  *See also* Barney Dep at 67 ("The packagers' essential job functions involve much more than running a case packer.").   Rather, Hendrixson acknowledged that this is the same job description that she received when Degussa hired her as a non-temporary employee in April 2005.  *See* Hendrixson's Dep 19:6 to 20:2.

Likewise, Hendrixson has not presented evidence contrary to plant manager Barney's statement that

[t]he packager has to be able to rotate.  No one is assigned to a specific machine or a specific task.  Based on customer demand, we will run various machines throughout a given day.  Somebody might be assigned to three or four different jobs within a given day.  We have to have packagers who are able to perform all the job functions within the facility.

Barney Dep at 70.  Hendrixson does not meaningfully contest the plant manager's explanation that

-33-

the packagers' ability to rotate was essential because it "allowed BCC to be responsive to market and seasons fluctuations in product demand" and "to provide coverage and flexibility [to adapt to] staffing changes, absences, and vacations."  Barney Aff ¶¶ 6 & 7.

For example, Hendrixson does not allege that she saw or heard of other packagers in this plant who were assigned full-time and exclusively to one task or machine (let alone present an affidavit or deposition testimony to that effect from, say, another employee).  Such evidence logically could have supported the inference that BASF did not in fact expect or need all its packagers to rotate, or be *able* to rotate if called upon.  In other words, there is no suggestion or evidence that BASF applied the rotation requirement exclusively or disproportionately to Hendrixson in order to exploit her physical/medical limitations and generate a reason for terminating her employment.

Given that Hendrixson says she was not disabled and did not request accommodations, Hendrixson has not identified any authority for the notion that the ADA obligated BASF to keep assigning her exclusively to the case-packer machine (or some other task that did not require lifting or other exertion inconsistent with Dr. Ilka's stated restrictions or the limitations admitted by Hendrixson herself).  *See generally Beery v. Associated Hygienic Prods., LLC*, 243 F. App'x 129, 133 (6th Cir. 2007) (Griffin, J.) ("[T]o obtain summary judgment on a regarded-as-disabled claim, a party must show that there is no genuine issue as to whether the employee's perceived disability *in fact* prevented him from doing any available suitable jobs.").

Even if the court assumes that BASF did not learn of Dr. Ilka's restrictions before deciding to terminate Hendrixson's employment – a dubious proposition at best – the limitations to which *Hendrixson herself* admitted were enough to lead BASF to conclude that she was incapable of

performing essential functions of the packager position.  For example, Hendrixson's admitted pre-litigation statement and her deposition testimony alone establish that she could not safely wield the bulky hose used on the Hydrozo product line.

Moreover, Hendrixson has not denied that she characterized herself to BASF as claustrophobic; has not contested BASF's statement that this condition made her unwilling to wear a respirator; and has not denied that the unwillingness to wear a respirator rendered her unable to perform certain non-packager tasks to which she might have been reassigned in an attempt to keep her employed at the plant.[16]

Nor has Hendrixson contradicted BASF's statements that each case packer machine required only one worker; there were only four case packer machines in the plant; "[o]f the four machines, two run maybe once a month, twice a month", with only two running on "a more regular basis . . . daily depending on customer demand"; and that the case-packer machines "may be shut down due to demand or for preventative maintenance or for changeover."  Barney Dep 12:17 to 13:19.  In turn, she has not shown a genuine dispute as to Barney's statement that "[t]here are times if the [case packer] machines weren't running, there were no jobs for her to be assigned to.  * * * [A]ll the other jobs in the plant are over 25 pounds."  Barney Dep at p. 55 and Barney Aff ¶ 17; *see also* Deposition of Francis Korteway dated March 6, 2008 at 19:14-23 (another Mattawan plant employee recalls that

---

[16]

The court does not suggest that BASF was legally *obligated* to try to find non-packager tasks for Hendrixson.  The court notes only that, given Hendrixson's professed limitations, BASF could not realistically do even that.  *See Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007): even when an employee shows that she is disabled and requests an accommodation – neither of which applies to Hendrixson – the duty to accommodate "does not require employers 'to create new jobs [or] displace existing employees from their positions . . . in order to accommodate a disabled individual.'" *Id.* at 869 (quoting *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)).

when she tried to work with a five-pound restriction, BASF soon sent her home "[b]ecause we don't

have light duty", i.e., regularly available positions that do not require substantial lifting and physical

exertion).[17]

In short, on this record, BASF has shown that it honestly believed that Hendrixson was

unable to perform essential functions of the packaging position, and it arrived at that belief through

_____

[17]

Hendrixson alleges that she currently has a fairly strenuous job which she performs without physical limitation or difficulty:

> In February 2007 I began to work for a temporary agency.  I was assigned to work in a factory, which was Eimos in Vicksburg, MI.  Beginning in late April 2008, I began working for Charles River in Portage, Michigan as a support technician.  I clean cages, moves rats around, change beddings and feed the rats.  I have to lift bags of feed.  I also have to push things, including carts full of feed and bedding and other objects that weigh more than 100 pounds, around.  I have had to lift more than 25 pounds at both jobs frequently, particularly in the present one I have.  I have had no problems whatsoever doing this work.

Hendrixson's Aff ¶ 6; *see also* Hendrixson's Dep 6:16 to 9:24.  Because Hendrixson is opposing summary judgment, the court must accept these allegations as true, but they do not help her to show a genuine issue as to any fact material to her ADA claim.  By definition, BASF could not have been aware of Hendrixson's post-termination physical condition and job performance at the time it decided to terminate her employment.  Therefore, these facts have no bearing on whether BASF had an "honest belief", derived from "reasonable reliance" on "particularized facts" before it, *Balmer*, 423 F.3d at 614, that Hendrixson was unable to perform essential function(s) of her job as a packager.

Evidence of a person's physical condition and ability to lift and move certain weights at one time *might* be probative circumstantial evidence of that person's physical condition and ability to lift and move the same or similar weights at a slightly earlier time.  On an appropriate record, one might infer that if Hendrixson could safely and effectively perform certain physical tasks at one time, she could safely and effectively do comparably demanding tasks for BASF at a slightly earlier time.  (The court assumes *arguendo* that April 2008 is sufficiently close in time to July 2006 to permit such an inference, even though such a time lapse arguably undermines the logical validity or persuasive value of the inference.)  But no reasonable factfinder could draw this inference in the face of Hendrixson's admissions that she could not perform certain essential functions of her job at BASF – not after employment with BASF, *but precisely during her employment with BASF and shortly before her termination* (at the least, the Hydrozo line's hose function and any functions that require the worker to wear a respirator).

"reasonable reliance" on the "particularized facts" that were before it when it made the termination decision. And BASF's belief was not only subjectively honest – it was accurate. *See Mahon v. Crowell*, 295 F.3d 585, 592 (6th Cir. 2002) (affirming summary judgment for employer on ADA claim; "Mahon has not shown that TVA regarded him as disabled under the statutes because he has not shown that TVA held any *mistaken* belief about him.") (emphasis in original); *cf. Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (affirming jury verdict in favor of employer on ADA regarded-as-disabled claim; "Far from evidencing that Ohio Casualty *mistakenly believed* Gruener's impairments substantially limited her ability to perform manual tasks, this testimony only speaks to Gruener's *actual* inability to perform this activity.") (citing *Sutton*, 527 U.S. at 489-90).

Therefore, no reasonable factfinder could find that BASF's stated reason for Hendrixson's termination was a pretext for illegal regarded-as-disabled discrimination in violation of the ADA. *See Scott v. Metropolitan Health Corp.*, 234 F. App'x 341, 352 (6th Cir. 2007) (Griffin, J.) ("'If there is no reasonable dispute that the employer made a reasonably informed and considered decision that demonstrates an honest belief in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.'") (quoting *Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005)).

BASF is entitled to summary judgment on the ADA regarded-as-disabled claim. *See Scott*, 234 F. App'x at 352 (*an employer is entitled to judgment as a matter of law if the record conclusively reveals some other, nondiscriminatory reason for the employer's decision,* or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)) (emphasis added).

### DISCUSSION:  Hendrixson's State-Law Claim

That leaves Hendrixson's claim under the Michigan Persons with Disabilities Civil Rights

Act, MICH. COMP. LAWS § 37.1101 *et seq.*[18]

Preliminarily, the court notes that "[s]upplemental jurisdiction is a doctrine of discretion .

. . not of right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003).  Having disposed

of Hendrixson's lone federal claim, the court exercises its discretion under 28 U.S.C. § 1367(c)(3)

and declines supplemental jurisdiction over the claim which arises under state law.  *See Allen v. City*

*of Sturgis*, – F. Supp.2d –, –, 2008 WL 2345942, *11 (W.D. Mich. June 5, 2008) (Maloney, J.)

(citing, *inter alia*, *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal

court that has dismissed a plaintiff's federal-law claim should not ordinarily reach the plaintiff's

state-law claims.") (citing 28 U.S.C. § 1367(c)(3) and *United Mine Workers of Am. v. Gibbs*, 383

U.S. 715, 726 (1966) ("Certainly if the federal claims are dismissed before trial . . . the state claims

should be dismissed as well.")), *cert. denied*, – U.S. –, 127 S.Ct. 1832 (2007)); *see also Musson*

*Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal

claims are dismissed before trial, the balance of considerations usually will point to dismissing the

---

[18]

Hendrixson's opposition brief has a section entitled "The Plaintiff Acknowledges that this Court Should Dismiss the Plaintiff's Regarded as Disabled Claim Under State Law."  *See* Hendrixson's Opp at 18-19.  Hendrixson further states, "The plaintiff acknowledges that . . . the Michigan Supreme Court has, as a practical matter, read out of the state Persons with Disabilities Civil Rights Act the perception of disability or regarded as disabled discrimination claim." Hendrixson's Opp at 19 (going on to discuss *Michalski v. Bar Levav*, 463 Mich. 723 (Mich. 2001)). Because Hendrixson has not amended the complaint or otherwise filed notice that she is abandoning the state-law claim, the court does not treat that claim as abandoned.  Today's disposition does not impair Hendrixson's right to file the state-law claim in state court if she wishes (subject, of course, to any Michigan statute of limitations and "savings" statutes which may apply).

state law claims . . . .").

The interests of justice and comity are served by deferring to Michigan's courts, which are best equipped to interpret and apply their own State's disability-discrimination statute[19] in the first instance.  *See Allen*, – F. Supp.2d at –, 2008 WL 2345942 at *11 (citing, *inter alia*, *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 585 (6th Cir. 2005) ("We hold that the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the state law issues based on its consideration of the interests of justice and comity best served by a state court's resolution of the remaining state law claims.")); *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (noting that only "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial").[20]

_____

[19]

Although "Michigan's Persons with Disabilities Civil Rights Act substantially mirrors the ADA," *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002), the two are not identical.  For this reason, our Circuit has cautioned that "resolution of a plaintiff's ADA claim will generally, *though not always*, resolve the plaintiff's PWDCRA claim." *Id.* (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 n.3 (6th Cir. 1998) and *Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 405 (Mich. App. 1999)) (emphasis added).  Michigan's courts are best equipped to decide whether the PWDCRA's differences from the ADA are material on these facts.

[20]

*See, e.g.,* exercising 28 U.S.C. § 1376(c)(3) discretion to decline supplemental over state-law claims and dismiss those claims without prejudice:

*Allen v. City of Sturgis, Michigan*, – F. Supp.2d –, –, 2008 WL 2345942, *12 (W.D. Mich. 2008) (Maloney, J.) (declining supplemental jurisdiction over Michigan Persons with Disabilities Civil Rights Act claim); *Michigan Elec. Employees Pension Fund v. Encompass Elec. & Data, Inc.*, – F. Supp.2d –, –, 2008 WL 2115204, *30 (W.D. Mich. 2008) (Maloney, J.);

*Poindexter v. McKee*, 444 F. Supp.2d 783 (W.D. Mich. 2006) (Miles, J.);
*Reinhardt v. Dennis*, 399 F. Supp.2d 803, 811 (W.D. Mich. 2005) (McKeague, J.);

*Glover v. Elliott*, 2007 WL 4557853, *5 (W.D. Mich. Dec. 21, 2007) (Bell, C.J.) ("In light

-39-

## ORDER

The defendant's motion for summary judgment [Dkt # 20] is **GRANTED in part and DENIED without prejudice in part.**

The ADA claim is **DISMISSED with prejudice.**

The MPDCRA claim is **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1367(c)(3).

**This is a final order.  This order is appealable** both as to the disposition of the federal claim and the decision not to exercise jurisdiction over the state-law claim.  *See Reynosa v. Schulz,* – F. App'x –, –, 2008 WL 2491620, *3 (6th Cir. 2008) ("We review a district court's decision to exercise pendent jurisdiction, meaning that this court will not reverse unless the court below 'relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard . . . .'") (quoting *US v. Chambers*, 441 F.3d 438, 446 (6th Cir. 2006)).

**IT IS SO ORDERED this 20th day of August 2008.**

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

─────────────

of the entry of summary judgment on Plaintiff's federal claims at an early stage . . . , the Court finds no good reason to exercise supplemental jurisdiction over Plaintiff's state law claims.");

*Forner v. Robinson Twp. Bd.*, 2007 WL 2284251, *8 (W.D. Mich. Aug. 7, 2007) (Quist, J.);

*Henderson v. Caruso*, 2007 WL 1876471 (W.D. Mich. June 28, 2007) (adopting R&R of Greeley, M.J.); *Williams v. Grand Rapids Pub. Library*, 2007 WL 3346625, *7 (W.D. Mich. Nov. 9, 2007) (adopting R&R of Scoville, M.J.);

*Hardin v. MDOC*, 2007 WL 1975102, *8 (W.D. Mich. Mar. 28, 2007) (Carmody, M.J.); *Lavean v. Randall*, 2005 WL 2405957, *8 (W.D. Mich. Sept. 29, 2005) (Brenneman, M.J.); *Herron v. Caruso*, 2005 WL 1862036, *6 (W.D. Mich. Aug. 2, 2005) (Edgar, J.).